IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RALPH WILLIAM MCCLAIN, JR., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SGT ALVERIAZ, LT. DOYLE, C.O. | : | |
| SHOVLIN, C.O. HUESBY, C.O. SEVERA, | : | NO.  07-5551 |
| C.O. SANCHEZ, DR. FISHTEIN, and | : | |
| JOHN DOES #1-3 | : | |

## MEMORANDUM

RONALD L. BUCKWALTER, S.J.                                          October 26, 2009

Currently pending before the Court is:  (1) a Motion for Judgment on the Pleadings or, in

the Alternative, for Summary Judgment, filed by Defendant Mark Fishtein, M.D.; (2) a Motion

for Judgment on the Pleadings by Defendants Sanchez, Alveriaz, Doyle, Shovlin, and Severa;

and (3) a Motion to Dismiss by Defendant Thomas.  For the reasons which follow, all of the

Motions are granted and judgment is entered against Plaintiff on his Amended Complaint.

## I.    FACTUAL AND PROCEDURAL HISTORY

According to the facts set forth in the Amended Complaint, Plaintiff Ralph William

McClain, Jr. was an inmate at the State Correctional Institution at Graterford in Collegeville,

Pennsylvania, during the time period relevant to this case.  (Am. Compl. 1.)  At approximately

8:00 a.m. on December 29, 2005, Defendant Sargeant Alveriaz came to Plaintiff's cell and told

him he had an appointment to see the psychiatrist, Defendant Mark Fishtein, M.D.  (Id. at 14.)

Plaintiff responded that he did not feel like going to the infirmary, since it would have entailed

being handcuffed and walking in the rain.  (Id.)  He stated that if Dr. Fishtein wished to speak to him, he would have to come to his cell.  (Id.)

Sometime between 8:30 and 9:00 a.m., Defendant Correctional Officer ("C.O.") Huesby went around to each cell with a shower list and Plaintiff requested that his name be added.  (Id.) Defendant C.O. Shovlin and Sgt. Alveriaz came to Plaintiff's cell at around 9:30 to 9:45 a.m. and told him it was time for his shower.  Plaintiff stripped down to his undershorts, put on his shower shoes, wrapped a towel around his waist, and grabbed his washcloth and soap.  (Id.)  He was cuffed behind his back and led out his cell door.  (Id.)  As Plaintiff started to go through the B-wing door on the right, Sgt. Alveriaz blocked Plaintiff and told him to go through the D-wing door to the left, since the showers on B-wing were full.  (Id.)

When Plaintiff got to the door to the hall between A-wing and D-wing, Sgt. Alveriaz held the door open for Plaintiff.  (Id. at 15.)  There were several officers on the other side when Plaintiff entered.  (Id.)  Suddenly, Sgt. Alveriaz slammed Plaintiff into the door, grabbed his arms from behind, and held him with his face smashed against the window.  (Id.)  While he was held up on the A-wing door, looking through the glass, Plaintiff saw C.O. Sanchez sitting and watching the events from her desk.  (Id. at 15-16.)  Defendant Lieutenant Doyle was in the control room and came out at this turn of events.  (Id. at 15.)  Lt. Doyle said Plaintiff was not getting a shower, but was going to see Dr. Fishtein whether he liked it or not.  (Id.)  Plaintiff stated that he had a right to refuse to go to a doctor's appointment and that he was not going to go out in the rain in his underwear.  (Id.)  In response, Lt. Doyle instructed his officers to lead Plaintiff out of the block.  (Id.)  When Plaintiff would not walk, Doyle directed the officers to "take him down."  (Id.)

2

At these words, multiple officers, including Defendant C.O.s Severa and Huesby, rushed Plaintiff and slammed him on the floor.  (Id.)   After being thrown to the floor, he starting cursing at the officers and was punched in the back of the head several times.  (Id. at 16.)  Plaintiff tried to kick one of the officers, after which his legs were restrained by leg irons and he started receiving kicks to the body and punches to the back.  (Id.)

Thereafter, several Defendants picked up and carried Plaintiff, ramming his head into the walls three or four times, and then dropping him on the floor because he was twisting and too heavy for the guards.  (Id.)  Upon dropping Plaintiff, Defendant officers starting punching and kicking him again.  (Id.)  One of the officers then whistled for a vehicle at the end of the walkway and instructed the driver to come up on the grass.  (Id.)  The officers dropped Plaintiff on the concrete and held him down on his stomach, wearing just his boxers and shower shoes.  (Id.)  Someone threw a pillowcase over his head, picked him up, and put him in the seat of the vehicle.  (Id.)  An officer sat behind him, put his arm around Plaintiff's neck, and held his head to the back of the seat, strangling him and making it hard to breathe.  (Id. at 17.)

After Plaintiff got out of the vehicle, he agreed to walk to avoid further beatings.  (Id.)  The pillowcase was taken off of his head and multiple guards escorted him to the infirmary.  (Id.)  When they arrived at the psychiatric cell, the handcuffs and shackles were removed and he was stripped of his underwear.  (Id.)  The whole time, Plaintiff was cursing the guards for what they were doing.  (Id.)  Defendant C.O. Severa called Plaintiff a "nigger" and swung at Plaintiff's face.  (Id.)  Plaintiff fought back, a melee ensued, and several guards joined the fight.  (Id.)  He was taken down on the floor again and, while he was being held down, he was punched, kicked, and had his arms twisted.  (Id.)  After he was let up and left alone in the cell, he asked to speak to

a nurse.  (Id.)  Defendant Nurse Priscilla Thomas came and Plaintiff reported his injuries, but she said she could do nothing about it.  After the shift change, he asked the new nurse for help, to no avail.  (Id.)  He was left in the cell naked and without a blanket until he was returned to his own unit the next day.  (Id.)  According to the Complaint, this attack was prompted by Dr. Mark Fishtein, who ordered that the officers seize Plaintiff by force and throw him into a psychiatric cell without any clothes.  (Id. at 12.)

On December 31, 2007, Plaintiff commenced the present federal litigation against Sgt. Alveriaz, Lt. Doyle, C.O. Shovlin, C.O. Huesby, C.O. Severa, C.O Sanchez, C.O. Doe, C.O. Doe 2, C.O. Doe 3, and Mark Fishtein, M.D.  In his Complaint, Plaintiff alleged violations of his Eighth and Fourteenth Amendment rights.  With leave of Court, Plaintiff filed an Amended Complaint on September 26, 2008, adding Defendants Nurse Thomas and Nurse Heather and offering a more detailed account of the facts.  Defendant Fishtein moved to dismiss this Amended Complaint on October 9, 2008 and, by way of Memorandum and Order dated November 25, 2008, this Court dismissed only the Fourteenth Amendment claim against Fishtein.

Subsequently, Defendant Thomas moved to dismiss Plaintiff's Amended Complaint on the grounds of failure to exhaust administrative remedies.  Due to the perceived failure of Plaintiff to respond in timely fashion, the Court issued an Order, dated March 11, 2009, granting the motion and dismissing the Amended Complaint as against Defendant Thomas.  On March 12, 2009, the Court received Plaintiff's response to that motion.  In the meantime, on March 9, 2009 and March 12, 2009 respectively, Defendant Fishtein filed:  (1) a Motion to Dismiss under Rule 12(c) or, in the alternative, for summary judgment based on Plaintiff's failure to exhaust

4

administrative remedies; and (2) a Motion to Dismiss for Lack of Prosecution under Rule 41(b).

Plaintiff timely responded to both motions and also moved to strike the Order granting Defendant

Thomas's motion.  Thereafter, on April 8, 2009, Defendants Sanchez, Alveriaz, Doyle, Shovlin,

and Severa also filed a Motion for Judgment on the Pleadings based on Plaintiff's alleged failure

to exhaust, and Plaintiff timely responded.

Via Order dated May 15, 2009, this Court addressed all of the above pending motions.

First, the Court granted Plaintiff's Motion to Strike the March 11, 2009 Order dismissing

Defendant Thomas in light of the fact that, under the prisoner mailbox rule, Plaintiff had timely

filed a response, which the Court had failed to consider.  Second, the Court denied Defendant

Fishtein's Motion to Dismiss for Lack of Prosecution.  Finally, as to (a) Defendant Thomas's

reinstated Motion to Dismiss; (b) Defendant Fishtein's Motion to Dismiss or, in the Alternative,

for Summary Judgment; and (c) Defendants Olivarez, Severa, Shovlin, Sanchez, and Doyle's

Motion for Judgment on the Pleadings, the Court found a genuine issue of fact as to whether

Plaintiff's non-exhaustion of his administrative remedies was excused by prison officials' failure

to properly transmit to Plaintiff the denials of his administrative grievances.  Accordingly, the

Court notified all parties that the motions would be converted into summary judgment motions

and that an evidentiary hearing would be held to resolve the remaining factual questions.

On October 6, 2009, this Court conducted an evidentiary hearing to determine whether

Plaintiff's failure to properly exhaust administrative remedies was excused by the prison's failure

to properly transmit his grievances to him.  The Court heard testimony from both Wendy

Shaylor, the Grievance Coordinator at Graterford Correctional Institution ("Graterford"), and

from Plaintiff.  In addition, Defendant introduced several new exhibits into evidence.  Having

considered the parties' briefs, together with the evidence and testimony from the administrative

hearing, the Court now conducts a joint discussion of the three pending defense motions.[1]

## II.   DISCUSSION

All of the Defendants' Motions seek dismissal of Plaintiff's Amended Complaint due to

Plaintiff's alleged failure to exhaust his administrative remedies.  The Court finds that

Defendants have met their burden of proof on this affirmative defense.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a),[2] prohibits an inmate

from bringing a civil rights suit alleging specific acts of unconstitutional conduct by prison

officials, including the use of excessive force, until the inmate has exhausted available state

remedies.  42 U.S.C. § 1997e(a) (2003).  A prisoner must exhaust administrative remedies or risk

procedural default.  Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004).  The PLRA requires "proper

exhaustion," meaning that the prisoner must complete the available administrative review

process in accordance with the applicable procedural rules, including deadlines.  Woodford v.

---

[1]  Notably, a district court may act as a factfinder in resolving a factual dispute with respect to a failure to exhaust defense.  Bryant v. Rich, 530 F.3d 1368, 1373-74 (11th Cir. 2008), cert. denied, 129 S. Ct. 733 (2008).  Because exhaustion of administrative remedies is a matter in abatement that does not deal with the merits, a judge may consider facts outside of the pleadings and make factual findings necessary to resolve a motion on those grounds, so long as the resolution of the factual disputes does not decide the merits and the parties have a sufficient opportunity to develop a record.  Id. at 1374-76.

[2]  This section states as follows:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C.A. § 1997e(a).

6

Ngo, 548 U.S. 81, 90-91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules . . . ."); see also Wright v. State Corr. Inst. at Greene, No. CIV.A.06-865, 2009 WL 2581665, at *2 (W.D. Pa. Aug. 20, 2009).  If a prisoner does not exhaust available administrative remedies, his claims should be dismissed.  Booth v. Churner, 532 U.S. 731, 740-41 (2001)  (affirming the holding of the Third Circuit which upheld the district court's decision to dismiss Plaintiff's complaint without prejudice for failure to exhaust administrative remedies).

Because an inmate's failure to exhaust under the PLRA is an affirmative defense, it must be pled and proven by defendant.  Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002). Consequently, a prisoner does not have to allege in his complaint that he has exhausted administrative remedies.  Id.  When raised as an affirmative defense, however, exhustion of all administrative remedies is mandatory.  Spruill, 372 F.3d at 227.  Thus, it is irrelevant whether the inmate believes that such administrative remedies would be effective or whether the available administrative processes can grant the desired remedy.  Booth, 532 U.S. at 740-41.  The exhaustion requirement applies to grievance procedures "regardless of the relief offered by the administrative procedures."  Id. at 741; Nyhuis v. Reno, 204 F.3d 65, 76 (3d Cir. 2000).  In other words, there is no futility exception to the PLRA's exhaustion requirement.  Nyhuis, 204 F.3d at 71.  Thus, the exhaustion requirement is not waived even in cases where the relief sought in the federal action cannot be provided by the administrative process in the prison.  Porter v. Nussle, 534 U.S. 516, 524 (2002); Booth, 532 U.S. at 741.

Nonetheless, "compliance with the administrative remedy scheme will be satisfactory if it is substantial."  Nyhuis, 204 F.3d at 77-78 (3d Cir. 2000).  The Third Circuit has repeatedly

noted that administrative remedies are not readily available, as required by § 1997e, where prison officials mislead or otherwise preclude an inmate from exhausting prison grievances.  In such cases, the exhaustion requirement is excused.[3]  See, e.g., Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (holding that district court incorrectly dismissed claim because it did not consider prisoner's allegations that he had been denied grievance forms by prison officials); Brown v. Croak, 312 F.3d 109, 112 (3d Cir. 2002) (finding that prisoner's claim that he was misled by prison officials precluded dismissal based on exhaustion requirement); Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000) (noting that prisoner who was misled by prison officials regarding grievance procedure faced a Catch-22 situation which could preclude finding of non-exhaustion); see also Oliver v. Moore, No. CIV.A.04-1540, 2005 WL 1988996, at *3-4 (3d Cir. Aug. 18, 2005) (holding that while administrative remedy may be deemed unavailable where prison officials prevented pursuit of prison grievance process, where no evidence of such interference is found, exhaustion is not excused).

Several other circuits have faced the precise question at issue in this case and expressly held that the exhaustion requirement is satisfied where prison officials fail to timely respond or to respond at all to an inmate's written grievance.  In such cases, the grievance procedure is deemed "unavailable" and the exhaustion requirement is excused.  See, e.g., Boyd v. Corr. Corp. of Am., 380 F.3d 989, 996-97 (6th Cir. 2004) (declining to dismiss complaint for failure to exhaust where plaintiff alleged that he did not receive a response to his grievance); Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004) (concluding that the affirmative defense of exhaustion is subject to

---

[3] Notably, "[t]he availability of administrative remedies to a prisoner is a question of law."  Brown, 312 F.3d at 111.

estoppel if prison officials preclude the inmate from exhausting administrative remedies);

Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002) ("[W]e agree that the failure to

respond to a grievance within the time limits contained in the grievance policy renders an

administrative remedy unavailable . . . ."); Lewis v. Washington, 300 F.3d 829, 833 (7th Cir.

2002) ("We join the Eighth and Fifth circuits on this issue because we refuse to interpret the

PLRA so narrowly as to . . . permit [prison officials] to exploit the exhaustion requirement

through indefinite delay in responding to grievances." (internal quotation marks omitted)); Foulk

v. Charrier, 262 F.3d 687, 698 (8th Cir. 2001) ( "[O]nce [the prison] failed to respond to [the

prisoner's written grievance], no further administrative proceedings were 'available' to him.");

see also Gellock v. Prison Health Servs., Inc., No. CIV.A.07-8, 2009 WL 2038235, at *7 (W.D.

Pa. Jul. 8, 2009) (finding that where plaintiff claimed that he never received responses regarding

his grievances, where he submitted copies of request slips sent to the grievance coordinator

stating that he had not received responses, and where the record was otherwise devoid of any

evidence that responses were ever provided by the prison, the court found that the administrative

remedies were rendered unavailable and the grievances must be deemed exhausted).

The question now pending before the Court is whether Plaintiff has exhausted his claims

through the requisite administrative process and, if not, whether the prison's responsive actions

rendered the administrative process unavailable.  Such an issue demands that the Court first

consider the contours of the applicable grievance processes and then analyze whether Plaintiff

substantially and sufficiently exhausted his administrative remedies.

A.      **Definition of the Applicable Administrative Procedures**

The Third Circuit has recognized that because there "is no express federal law describing

the procedural requirements with which prisoners must comply in satisfying § 1997e(a)'s

exhaustion requirement," the procedures set out in a prison's administrative grievance program

serve as the measure for whether an inmate has exhausted his administrative remedies.  Spruill,

372 F.3d at 231.  To determine whether a prisoner has properly exhausted administrative

remedies, the Court thus looks not to federal law, but to the prison grievance procedure as

defined by the prison itself.  Id. at 231-32.

The Pennsylvania Department of Corrections ("DOC") has three different administrative

remedy processes which collectively provide an inmate a route to challenge every aspect of

confinement.  Fortune v. Bitner, No. CIV.A.2006 WL 2796158, at *7 (M.D. Pa. Sep. 25, 2006).

Those policies are: (1) the Inmate Grievance Policy, DC-ADM 804; (2) the Inmate Discipline

Policy; DC-ADM 801; and (3) the Administrative Custody policy, DC-ADM 802.  See Pa. Dept.

of Corr. Policies, http://www.cor.state.pa.us/standards/cwp/view.asp?a=463&q=131813&portal

Nav= (last visited Oct. 20, 2009).  The three programs address specific issues which may arise

within the prison and one administrative remedy may not be substituted for the other.  Fortune,

2006 WL 2796158, at *7; (Notes of Testimony ("N.T.") 16:16-17:7, 20:6-16, 40:20-21:5, Oct. 6,

2009.)  An inmate who has received a misconduct citation – i.e. a violation of DOC rules and

regulations with a resulting disciplinary measure – and either seeks to appeal that misconduct or

allege a grievance in connection with the events surrounding that misconduct, must use DC-

ADM 801.  DC-ADM 801, http://www.cor.state.pa.us/standards/lib/standards/801_Inmate

_Discipline.pdf ("DC-ADM 801"); (N.T. 20:6-29, 43:5-18.).   DC-ADM 802 is similar, but

10

applies to those who are in administrative custody.  DC-ADM 802, http://www.cor.state.pa.us/

standards/lib/standards/DC-ADM_802_Administrative _Custody.pdf ("DC-ADM 802").

Finally, DC-ADM 804 applies to all inmate grievances not connected with a misconduct citation.

DC-ADM 804, http://www.cor.state.pa.us/standards/ lib/standards/DC-ADM_804_Inmate_

Grievances.pdf ("DC-ADM 804"); (N.T. 16:20-17:5.)

     Only DC-ADM 801 and 804 are relevant in this case, as Plaintiff was not in

administrative custody.  Under DC-ADM 801, when an inmate gets a misconduct report or rule

violation, he will undergo either an informal or formal resolution process depending on the

gravity of the offense.  DC-ADM 801 § 1.A.  An inmate who has been found guilty on a

misconduct charge may then, within fifteen days of the hearing, file an appeal to a Program

Review Committee ("PRC") by using the DC-141, Part II (E), Misconduct Hearing Appeal form.

DC-ADM 801 § 5.A.1; (N.T. 22:10-15; 43:5-18.)   The PRC will then review the appeal and

make a decision.  DC-ADM § 5.A.; (N.T. 22:10-15, 43:17-18.)  Within seven days of that

decision, the inmate may file a second level appeal to the Superintendent/Facility Manager.  DC-

ADM 801 § 5.B.1; (N.T. 22:10-15.).  Finally, the inmate has one last avenue of appeal to the

Office of the Chief Counsel.  DC-ADM 801 § 5.C.1; (N.T. 22:10-15.)  Once all of these steps are

pursued, an inmate will be deemed to have exhausted administrative remedies.

     DC-ADM 804 offers a similar three-phase review procedure.  An inmate who has a

concern that he is unable to resolve may submit a DC-804, Part 1, Official Inmate Grievance

Form to the Facility Grievance Coordinator ("FGC") within fifteen days of the date of the events

giving rise to the grievance.  DC-ADM 804, § VI.A.  The FGC then makes sure the grievance

complies with the procedures and, if not, she rejects it and returns it to the inmate within five

working days.  Id. § VI.B.6; (N.T. 16:20-17:7)  If so, then she assigns it a grievance tracking

number and gives it to a grievance officer for investigation.  DC-ADM 804 § VI.B.1 & 7; (N.T.

16:24-17:5.)  Within ten working days, the FGC transmits a decision on the grievance to the

inmate.  DC-ADM 804 §. VI.B.7.  If the inmate is dissatisfied with either the rejection or

disposition on the merits, the inmate may, within ten days of the FGC's decision, appeal to the

Facility Manager/Superintendent, who must provide a decision within another ten working days.

Id. § VI.C.1; (N.T. 17:10-14.)  Finally, an inmate may submit an appeal to the Secretary's Office

of Inmate Grievances and Appeals within fifteen working days from the date of the Facility

Manager's decision, and the Secretary's Office has thirty days in which to issue a decision.  DC-

ADM 804 § VI.D.1; (N.T. 17:14-20.)

### B.   Whether Plaintiff Complied with the Administrative Process or Was Otherwise Excused from Exhaustion

In the case at bar, the evidence submitted by the parties reveals the following undisputed

facts.  On January 10, 2006, Plaintiff filed a grievance in accordance with DC-ADM 804

regarding an incident occurring on December 29, 2006 – the events of which are the subject of

this lawsuit.  (Defs.' Hrg. Ex. 1; N.T. 18:17-19:14)  On January 12, 2006, Wendy Shaylor (at the

time, Wendy Moyer), the FGC for SCI Graterford, assigned this filing grievance number 140939

and returned as rejected to Plaintiff.  (Defs.' Hrg. Ex. 2; N.T. 20:2-22.)  She indicated that he

"failed to comply with the provision(s) of DC-ADM 804 Inmate Grievance System," because

DC-ADM 804 was not the proper procedure for his grievance and should not be reviewed by her.

(Id.)  Ms. Shaylor testified at the evidentiary hearing that DC-ADM 804 was not available to

Plaintiff because he had been issued two misconduct citations in connection with the events of

December 29, 2006 and, as such, Plaintiff's available remedies were listed in DC-ADM 801. (Defs.' Hrg. Ex. 8; N.T. 20:23-21:9.)  According to Plaintiff, however, he never received a copy of this rejection.  (N.T. 46:19-47:11.)  On January 19, 2006, Plaintiff sent an Inmate's Request to Staff Member – a form used by inmates to correspond with staff – inquiring into the status of his grievance number 140939, as well as four other pending grievances.  (Def.s' Hrg. Ex. 3; N.T. 27:2-28:9.)  Ms. Shaylor simply assumed that her denial and Plaintiff's correspondence had crossed in the mail.  (N.T. 29:6-20.)

Subsequently, on February 10, 2006, Plaintiff submitted a second grievance form pursuant to DC-ADM 804.  (Def. Thomas's Mot. Dismiss, Ex. C; N.T. 31:4-32:2.)[4]  That grievance repeated the allegations set forth in his first grievance and also indicated that, "I originally submitted this grievance thru inhouse mail on 01-9-06, and am resubmitting it due to the fact that I nevver reciever a file# from the grievance coordinator."  (Def. Thomas's Mot. Dismiss, Ex. C.)  By way of rejection form dated February 15, 2006, Ms. Shaylor again returned the grievance to him, indicating that DC-ADM 804 was not the proper procedure.  (Defs.' Hrg. Ex. 4; N.T. 32:3-33:22.)  Again, Plaintiff indicated that he did not receive a copy of that rejection.  (N.T. 47:2-11.)

After the February 15, 2006 rejection notice, the record reflects no action on Plaintiff's grievance until the summer of 2006, when Plaintiff apparently submitted an appeal directly to the Secretary's Office of Inmate Grievances and Appeals.  On July 12, 2006, the Secretary's Office issued a letter denying Plaintiff's appeal.  (Def. Thomas's Mot. Dismiss, Ex. E.)  This letter

---

[4]  A copy of that grievance was not submitted at the evidentiary hearing, but was included as an exhibit to Defendant Thomas's Motion to Dismiss.  (N.T. 30:14-32:2.)

indicated that because Plaintiff had not yet appealed to the Superintendent of the institution, a

final review could not be granted.  (Id.)  On July 17, 2006, Plaintiff filed an intermediate appeal

with Superintendent DiGuglielmo, the Facility Manager.  (Defs.' Hrg. Ex. 5; N.T. 34:11-25:2.)

This appeal stated, in pertinent part:

> This appeal is apparently late due to the abundance of barriers I have been
> subjected to in my quest to have my grievance heard.  This is actually my 2nd
> appeal to you on this matter.  I submitted this grievance, along with a few outhers,
> to you last month ascerting the fact that I was not issued any return copies, file
> #'s, or responses for any of them (dispite my comlints to Ms. Moyer).  In turn you
> had Ms. Moyer address that appeal.  She sent several rejection forms, put #'s on
> the copies and issued me a letter stating I couldn't appeal my grievances if I was
> not issued responses and saying that I should have inquired about not recieving
> them before.  (Which I actually did do.)
>
> I took Ms. Moyer's letter to be the answer to the first appeal I submitted to you
> and appealed futher to The Cheif Grievance Officer, Sharon Burks.  Ms. Burks
> wrote me saying I did not appeal to you and I had to get a response from you
> before I could appeal to her.  So, I am now in fact submitting my secound appeal
> to you.
>
> This Grievance (#140939) is 2 parts.  I submitted the initial grievance in January.
> After recieving no word on it's status I submitted A secound one in February.
> According to what Ms. Moyer sent me in response to my first appeal to you
> (stated above) they both where rejected for not being applicable to DC-ADM 804.

(Id.)  Superintendent DiGuglielmo rejected this appeal, noting both that Plaintiff's appeal was

untimely and that Plaintiff's grievance pertained to a misconduct that he received and that

appeals of such misconducts are to be processed through DC ADM 801 procedures.  (Defs.

Thomas's Mot. Dismiss, Ex. G.)

Plaintiff then submitted another request for appeal of his grievance number 140939 to the

Secretary's Office of Grievance and Appeals.  Sharon Burks, Chief Grievance Officer, affirmed

the Superintendent's dismissal of the appeal as untimely on September 12, 2006.  She refused to reach the merits.  (Id. Ex. H.)

Having considered this record, the Court is compelled to find that Plaintiff has failed to exhaust his administrative remedies.  The evidence reflects that Plaintiff initially filed his grievance on the wrong form – using DC-ADM 804, as opposed DC-ADM 801.  Thereafter, no appeal was filed until at least four months after the denial of his second grievance, even though DC-ADM 804 mandates that appeal be filed within ten days of the decision.  See DC-ADM 804 § VI.C.1.  As proper exhaustion "demands compliance with an agency's deadlines and other critical procedural rules," Woodford, 548 U.S. at 90-91, the Court finds that Plaintiff clearly did not satisfy the PLRA's exhaustion requirement.

The inquiry, however, does not end at this juncture.  As explained in detail above, DC-ADM 804 requires an inmate to have in hand a decision from his grievance prior to the filing of any appeal.  Plaintiff repeatedly proclaims that he never received any rejection notices for his grievances.  Under well-established jurisprudence, the failure of Defendants to timely and properly transmit to Plaintiff the rejections of his initial administrative grievances, whether or not filed on the proper forms,[5] would render the administrative process unavailable to Plaintiff and require this Court to deem his claims exhausted.

Despite Plaintiff's arguments, however, the record compels the Court to find that Defendants met their burden of proving that Plaintiff, in fact, received the denials of his

---

[5]  Although not raised in their briefs, Defendants suggested at the evidentiary hearing that Plaintiff's failure to timely file his initial grievance on the proper form, in and of itself, resulted in a failure to exhaust administrative remedies.  As the Court finds failure to exhaust on other grounds, however, we decline to address this argument.

grievances.  First, Ms. Shaylor, the prison's Grievance Coordinator, testified at the hearing that

she always followed the same procedure with respect to inmate grievances.  Upon receipt, she

reviews the grievance to make sure that it complies and, if so, assigns it to a grievance officer for

investigation.  (N.T. 10:6-15, 16:20-7.)  If not, she rejects it and returns it to an inmate.  (Id.)

This process is done with a few days of her receiving the grievance.  (Id. at 21:10-16.)  To notify

inmates of her decision, she uses the in-house mailing system wherein she verifies the housing

location of the inmate and then has clerical staff in her office take it to that housing unit's

mailbox.  (Id. at 10:16-11:2, 24:4-14, 25:4-9.)  A housing unit official picks it up and delivers it

to the inmate.  (Id. at 11:5-14, 26:6-21.)  It could take days, even up to a week, for a rejection

form to travel from her office to an inmate.  (Id. at 25:22-23:5.)  It is her customary habit and

practice to follow this same procedure with respect to each grievance, and she recalled following

the procedure with respect to Plaintiff's grievance number 140439.  (N.T. 10:2-15, 10:23-11:2,

12:25-13:8.)  Further, she indicated that had Plaintiff not received the rejection, he could have

asked her for another copy, as she provides copies to other inmates on a regular basis.  (N.T.

29:25-30:4, 39:9-14.)

        The Court finds such evidence probative of the fact that Plaintiff actually received his

grievance rejections shortly after he submitted the actual grievances.  It is well-established, under

Federal Rule of Evidence 406, that "[e]vidence of . . . the routine practice of an organization,

whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove

that the conduct of the . . . organization on a particular occasion was in conformity with the . . .

routine practice." FED. R. EVID. 406.  "The purpose of habit evidence is to fill in a gap in direct

evidence about what a person did on a specific occasion with circumstantial evidence sufficient

to reasonably allow one to conclude that the person probably acted in conformity with his or her usual pattern on the occasion in question." Pugh v. Wynder, No. CIV.A07-3399, 2008 WL 2412978, at *14 (E.D. Pa. Jun. 10, 2008). Accordingly, Ms. Shaylor's testimony of her usual and customary practice is compelling evidence that prison officials sent Plaintiff his rejection forms.

Second, both the documentary evidence and Plaintiff's own testimony reveal that, on all other occasions, Plaintiff has received his mail through the prison mail system, and has specifically received other correspondence from Ms. Shaylor regarding other grievances. In January 2006, Plaintiff had five grievances pending, including number 140939. (N.T. 27:2-10; Defs.' Hrg. Ex. 3.) According to the grievance tracking system, two of the other four grievances were rejected and Plaintiff neither pursued any appeals nor suggested an absence of a response. (N.T. 37:23-38:14.) With respect to the third grievance, number 141382, Plaintiff received a response and appealed to the superintendent. (N.T. 38:14-20.) Finally, as to the fourth, grievance number 140677, it was rejected and Plaintiff appealed directly to central office, which reminded him to appeal to the superintendent first. (Id. 38:21-24.) Overall, Plaintiff was able to receive grievance responses on four of the five grievances pending at the time and was able to appeal several of them. (Id. at 38:25-39:8.) Moreover, Plaintiff himself indicated that in the past he had received his communication through the mail system. (Id. at 50:20-51:2.) Such evidence significantly undermines the credibility of Plaintiff's testimony that he never received any notifications on this lone grievance.[6]

---

[6] As noted in this Court's Order dated May 15, 2009, all of the Defendants' Motions currently pending have been converted into motions for summary judgment. At the complaint stage, Plaintiff's allegation "would be entitled to a presumption of truthfulness and would have stated a viable defense for failure to exhaust." Hill v. Smith, 186 Fed. Appx. 271, 273 (3d Cir.

Finally, even giving credence to Plaintiff's claim that he did not receive these rejections, the Court finds that he failed to put forth a substantial effort in pursuing his administrative remedies. Plaintiff filed his original grievance on January 10, 2006 and, having not heard anything within a few days, wrote to Wendy Shaylor to inquire as to the status of that grievance, among others. Such communication demonstrated Plaintiff's familiarity with and ability to use the inmate-staff correspondence system. When Plaintiff purportedly still heard nothing, he filed a second grievance on February 10, 2006. Although Ms. Shaylor testified that she promptly responded with a rejection, Plaintiff claims to have received no such response. Despite his ability to correspond with Ms. Shaylor and despite the fact that Ms. Shaylor clearly indicated that she often sent inmates second copies of her rejection notices, Plaintiff did nothing with respect to this grievance until, at the earliest, June of 2006 – approximately four months later – when he filed an appeal directly to the Secretary's Office of Inmate Grievances and Appeals.

The gravity of this delay is compounded by the fact that Plaintiff should have known that he needed to inquire into his grievances. Upon entering prison, he had been issued a handbook explaining the policies and procedures of how to appeal and/or file a grievance. (N.T. 42:18-23.) As noted above, DC-ADM 804 provides that an inmate will receive a rejection of a grievance within five working days of its submission, and a denial of a grievance within ten working days

---

2006). The Court, however, does not dismiss Plaintiff's suit at the complaint stage. As all the motions were converted into summary judgment motions, the parties had the opportunity to supplement the record and the Court resolved the factual questions pertaining to exhaustion on the basis of evidence presented before and during the evidentiary hearing on October 6, 2009. See id. at 274 (affirming district court's resolution of factual issues and dismissal of lawsuit on basis of plaintiff's failure to exhaust administrative remedies). "Where testimony is in direct conflict it is for the trial judge to determine credibility of witnesses in resolving dispute." Id. (citing United States ex rel. Tillery v. Cavell, 294 F.2d 12, 22 (3d Cir. 1961)).

of its submission.  Given such deadlines, Plaintiff should have expected to receive some sort of notice regarding his second grievance no later than early March 2006.  Yet, in the ensuing three and a half months, Plaintiff never sent any correspondence to Ms. Shaylor inquiring about the status of his grievances or seeking another copy of her decision.  Instead, he chose to wait until late June to early July, when he claims to have finally received copies of his rejections, to take any further action by filing an appeal to the highest level.  Such delays undermine any arguments that he substantially complied with his exhaustion obligations.[7]

Exhaustion requires completion of the entire administrative process.  Ahmed v. Sromovski, 103 F. Supp. 2d 838, 843-44 (E.D. Pa. 2000).  "If a prisoner fails to follow the required administrative procedures, including meeting deadlines, the inmate's action cannot be maintained."  Carrington v. Brennier, No. CIV.A.06-2428, 2007 WL 846616, at *2 (M.D. Pa. Mar. 19, 2007).  In this case, Plaintiff clearly failed to exhaust his administrative remedies.  Based on the evidence presented by the parties, the Court finds that Plaintiff's efforts were not thwarted by prison officials' failure to timely transmit his grievance rejections.  Moreover, even in the event that Plaintiff did not receive his grievance rejections, he failed to timely and diligently pursue the remedies available to him.

Under the PLRA, "[e]xhaustion is no longer left to the discretion of the district court, but is mandatory."  Woodford, 548 U.S. at 85.  Thus, "it is beyond the power of this court . . . to

---

[7] Any potential claim or suggestion by Plaintiff that prison officials actually *prevented* him from further pursuing his remedies is subverted by the sheer number of filings by Plaintiff in this Court, including motions to transfer venue, to strike orders by the Court, and for temporary transfer into federal custody.  In addition, Plaintiff has been able to timely respond to all motions by Defendants and even to write an obscene letter to counsel for Dr. Fishtein.

excuse compliance with the exhaustion requirement." <u>Nyhuis</u>, 204 F.3d at 73 (internal quotation marks omitted).  Because Plaintiff's time limit for exhausting his administrative remedies has long since expired, his claims are rendered procedurally defaulted.  <u>Spruill</u>, 372 F.3d at 229-30 (where an inmate has failed to exhaust his administrative remedies and can no longer do so within the relevant administrative limitations period, his claims are procedurally defaulted and must be dismissed).  In turn, the Court grants summary judgment, with prejudice, on the entirety of the Amended Complaint in favor of Defendants Thomas, Fishtein, Sanchez, Alveriaz, Doyle, Shovlin, and Severa and against Plaintiff.